**In re STAGE STORES, INC., Speciality Retailers, Inc., and Speciality Retailers, Inc. (nv), Debtors.**

**Stage Stores, Inc., et al.,**

v.

**General Electric Capital Corp.**

**Civ.A. No. H–01–877.
Bankruptcy No. 00–35078–H2–11.**

United States District Court,
S.D. Texas,
Houston Division.

Oct. 31, 2001.

Thomas R. McDade, Houston, TX, Lynnette Randee Warman, Dallas, TX, David A. Cheek, Oklahoma City, OK, for Appellants.

John P. Lewis, Jr., Dallas, TX, Benjamin R. Norris, Phoenix, AZ, for Appellee.

Opinion on Appeal

HUGHES, District Judge.

1. *Introduction.*

An airplane was sold by a company in bankruptcy. The sales price exceeded the direct obligations under the lease used to finance its acquisition. This is a dispute over that excess. The bankruptcy court recognized the secondary security interest of the lessor-creditor although it was not recorded with the Federal Aviation Au-

thority. The debtor appeals. The creditor is secure.

## 2. *The Deal.*

Specialty Retailers, Inc., and General Electric Capital Corporation had two agreements affecting General Electric's interest in an airplane—a lease and a lien. In the first, Specialty selected an airplane. General Electric bought it and leased it to Specialty.

As a conveyance of Speciality's possessory interest, the lease was recorded with the Federal Aviation Administration. Anticipating arguments about mere financing leases, the alternative view of the transaction is that the lease was recorded with the FAA as a conveyance of a security interest to General Electric. The lease was written to serve both interpretations.

The day after the lease, Specialty and General Electric entered into a second agreement. They used the airplane as collateral security for all of Specialty's obligations to General Electric for other leased equipment. General Electric filed this with the Texas Secretary of State.

Three years later, Specialty filed for bankruptcy. It is the debtor-in-possession. The airplane was sold for about $2.7 million. Specialty paid General Electric only the termination value in the lease—about $1.6 million—claiming it could keep the rest of sale proceeds. General Electric claimed the "excess" proceeds under the broader security interests of the second agreement.

## 3. *Issue.*

Specialty says General Electric has no interest secured—perfected—in the excess proceeds because it, as creditor, did not record the second agreement with the Federal Aviation Administration. The debtor asserts that:

- The second agreement had to be recorded with the Federal Aviation Administration; and
- The scope of the disclosure to the FAA limits the security interest.

## 4. *Perfection.*

▮▮▮ Interests in civil aircraft—including leases, financing or operating—must be recorded with the Federal Aviation Administration to be effective against nonparties without actual notice. General Electric filed the lease with the FAA's airplane registry in Oklahoma City three years before the bankruptcy. 49 U.S.C. § 44107 (2001) ("a conveyance that affects an interest in aircraft must be recorded").

The second agreement was properly filed with the Texas secretary of state, perfecting it. Speciality does not claim that General Electric does not have a properly perfected security interest through the second agreement; its only objection is that the second agreement's "conveyance" cannot apply to the airplane because it was not filed with the FAA.

By recording the lease, the creditor disclosed in the official records the basic transaction, and that was enough information to notify creditors of an alienated interest in the airplane. This satisfies the purpose of the federal law creating a national system for recording interests in civil aircraft, reducing the transaction costs of selling, buying, borrowing, and lending with respect to airplanes.

This scheme is parallel to state systems for interests in personal property. The states do not require that the instrument of title be recorded for personalty; the purpose of those filings is to notify a third party of an alienated interest—not of the details of the arrangement. TEX. BUS. & COM.CODE ANN. § 9.402, cmt. 2 (Tex. U.C.C.); *Crow–Southland Joint Venture v.*

*North Fort Worth Bank,* 838 S.W.2d 720, 724 (Tex.App.—Dallas 1992).

A creditor, looking at the FAA files, would know that it had to deal with an owner or creditor of some sort. General Electric had given notice of its interest in the airplane in the approved way. The new creditor could read the entire lease, but without conferring with the creditor, she would have no way to ascertain the value of the interest.

Standing alone, the second agreement would not protect the creditor's interest in the airplane, but it did not stand alone.

### 5. *Limitation.*

Specialty says that the text of the recorded lease would cause another creditor to rely on it for the scope of the obligations—to assume that the entirety of the interest is described in the lease. This is not the nature of these filings. By looking at the lease at the FAA, a potential creditor would not know whether the debtor had made the hire payments as scheduled or whether there were other instances of default. The terms of the lease do not disclose the balance due at a particular point. A reasonably prudent creditor would have discovered those things as well as the broader interest in response to its request for a representation from the creditor of the balance owed and the absence of defaults.

As with filings under the commercial code, the lease's having been filed would perfect a security interest without disclosing enlargements of the obligations in the original terms by extension or otherwise. *See generally* U.C.C. § 9 (2000). Although land recordings are categorically distinct from chattel filings, even there a deed of trust—a mortgage—would not disclose on the face of its several pages the current balance of the debt secured nor the existence of extensions or enlargements. *See*

*Clementz v. M.T. Jones Lumber Co.,* 82 Tex. 424, 427, 18 S.W. 599, 601 (1891) (finding that a recorded mortgage mentioning a note and debt is notice to later mortgagees, even if it omits the amount of the note and debt).

Although it would not create a question of equity, Specialty has not asserted that a creditor actually relied on the limits in the FAA filing to advance funds against the airplane or to Specialty generally. It is only asserting a technical failure as its own trustee on behalf of a hypothetical creditor's reliance to avoid the proceeds being paid to this creditor.

### 6. *Financing.*

■ Bailments are not debts. The transfer of possession of personal property without title is a bailment. A bailment for hire is just that; it is not a "lease" at law, since a lease is the transfer of possession of real property without title. Rather than lend money to the debtor and take a mere security interest in the equipment, this creditor decided to take advantage of retaining title in the equipment and hiring it to the debtor. A bailment for hire is a legal and practical way to arrange for the use of something. The past hire charges—like past due rent—become debts. The tendency in bankruptcy practice is casually to reduce the complex fabric of property, contract, and commercial law to "debts." *See River Prod., Co. v. Webb (In re Topco, Inc.),* 894 F.2d 727 (5th Cir.1990) (grants of mineral fee on a condition subsequent treated as a "lease" by the bankruptcy court); *In re Fuel Oil Supply & Terminaling, Inc.,* 837 F.2d 224 (5th Cir.1988) (exchange of oil treated as a debt instead of a bailment by the bankruptcy court).

■ Specialty got the benefits of General Electric's having title rather than a se-

curity interest. For reasons sufficient at the time, Specialty did not buy an airplane and borrow against it; now it wants to ignore the implications of how it chose to structure its business to the detriment of the only outfit to rely on this arrangement. If the debtor had sought a regular loan against the airplane, the interest rate, down payment, term, secondary security, and default options would have been different. If the debtor-in-possession wants to adjust the legal character of the transaction to its benefit, it should be required to re-adjust all those terms that would have been correspondingly different in favor of the creditor.

The bailment of the airplane did endow the debtor with most the indicia of actual ownership. The debtor-bailee insured and maintained the airplane. It was allowed to treat the equipment as its own for deducting the depreciation from its revenue. If the debtor had negotiated for the insurance obligation to remain with the creditor-bailor, the hire price would have simply been more than with the insurance being paid or the risk taken by the debtor-bailee. None of this is evidence of borrowing—it is pricing. An outright purchase is a "financing" arrangement.

Bankruptcy is an arbitrary imposition of the law—much like taxes—to spread as social policy some of the consequence of business failure. Achieving that goal does not require a careless confusion of the forms of other fields of law. Conceptual sloppiness is not equity.

7. *Set Off.*

 General Electric asked to apply the sales proceeds to Specialty's other obligations to avoid the absurdity of making it pay Specialty when Specialty owed it. The bankruptcy court refused, finding that no debt was owed and that, although the obligations arose pre-petition, General Elec-

tric could not set off its claim because the amount of Specialty's debt was unknown when the bankruptcy was filed. It is wrong.

If reciprocal debts are owed by the creditor and debtor before the bankruptcy, they may be applied against each other. 11 U.S.C. § 553. General Electric has a claim against Specialty through the use of the airplane as collateral security for all of Specialty's obligations to General Electric for other leased equipment. The obligation to pay excess proceeds is a debt. The claim and debt are mutual-the same entities owe each other something in the same capacity.

Uncertainty about the amount of Specialty's debt when bankruptcy was filed is no bar to setoff. Although the actual amount of the debt was not known, it was absolutely owed and became due once it could be calculated. *See Braniff Airways, Inc. v. Exxon Company, U.S.A.,* 814 F.2d 1030, 1035–36 (5th Cir.1987) ("debt owed to debtor in bankruptcy by creditor does not have to be calculated before filing of bankruptcy . . . for setoff to be available"). General Electric may setoff its claim.

8. *Option.*

Specialty insists that it had substantial equity in the airplane through its purchase option. It could have been true, but it is counter-factual now, for Specialty did not exercise its option. It chose to have the airline sold. To get the benefits of a contract, you must perform too.

9. *Conclusion.*

The award of the excess proceeds to General Electric is affirmed. The order denying it the right of setoff is reversed.